JOURNAL ENTRY AND OPINION
Defendant-appellant Juan Wallace appeals from his convictions following a jury trial for aggravated murder (R.C. 2903.01), two counts of kidnapping (R.C. 2905.01) and having a weapon while under disability (R.C. 2923.13). The aggravated murder and kidnapping counts also carried firearm specifications. Defendant appeals contending that the trial court erred in the admission of improper evidence; in giving erroneous jury instructions; and also claims the murder and kidnapping convictions were against the manifest weight of the evidence. We find no error and affirm.
This case arose from the shooting death of Joseph Smith in the 2100 block of East 74th Street in Cleveland on October 6, 1997. The State's case produced the following evidence.
Sandra Pinson discovered the body of the victim when she awoke on October 6, 1997 and looked out her bedroom window. She also saw a white vehicle parked on the other side of East 74th Street.
Jeffrey Lee Patton lived across the street at 2244 East 74th Street and heard six to eight shots fired around 1:50 a.m. on the morning of October 6, 1997. He looked outside but saw nothing unusual. He also noticed the white car parked in the street. Mr. Patton knew the defendant, as the defendant's mother and stepfather also live on East 74th Street and defendant lived there for a number of years.
Rebecca Ward testified that she and about six of her teenage cousins were sitting on the curb in front of her aunt's house on East 74th Street after midnight on October 6, 1997. She saw a white car turn the corner, shut off its lights and pull up in front of her aunt's house. There were three black males in the car. Her cousins ran because they thought they were going to be robbed. Rebecca stayed, but when the passenger got out of the front seat wearing a ski mask, she ran up the driveway. Another male got out of the back seat and ran up the driveway behind her. She and her cousins then ran towards a neighboring field and heard three shots then four or five more shots. She believed that she could identify the driver if she saw a picture. She could not identify the passenger because he was wearing a ski mask, but she noted that he was tall. She identified the third male from the backseat as the victim. She was not able to identify the defendant as being the driver or passenger of the car.
Daneca Cook testified that she was also with her cousin Rebecca and several other friends outside of their aunt's house. Daneca testified that she was at the side of the house when she heard a car pull up and her friends start screaming and running. She was about to follow them, but she heard a gun shot and ran to the back of the house. After she reached the back of the house, she heard two or three more shots. She then laid on the ground close to the house and put her head down. When she looked up, she saw the victim backing up to her. He stepped on her finger. Daneca testified that as he backed up, she heard him say "please don't do this. I swear on my mama I gave you everything, all that I had." The victim was then shot two times and fell on top of her. She laid still for about twenty minutes because she did not hear the shooter leave.
Kenneth Mann testified that on October 6, 1997, he was kidnapped at gunpoint by the defendant and another man. He had gone to a friend's house, Ruby Scales, on October 5th at about 11:00 p.m. The victim was at Ruby's and Mann spoke with him about buying some crack cocaine. Mann testified that everybody knew that the victim sold drugs. At about midnight, he asked the victim to drive him to the store for cigarettes. When they left to go to the store, two males came around the side of the building. One had a shotgun and the other a pistol. The defendant was one of the two men. Mann knew the defendant because they used to live on the same street. The two males told them to lay on the ground. The victim and the two males were on the driver's side talking while Mann was lying on the passenger's side. Mann then heard one of the men say "you know, you crossed me."
Also, while this was happening, Ruby Scales came to the door and yelled out asking if Mann and the victim were still going to the store. One of the men told Mann to say yes, so he did. He did not believe that Ruby could see him lying on the ground on the far side of the car. One of the males told Mann to get in the car. The victim and the two males continued talking. Defendant then told Mann to get out of the car. Defendant was armed with a shotgun. After he got out of the vehicle, as ordered, he ran away to find someone to tell. He then saw the white car drive out of the lot and drive towards Quincy Avenue. He could not tell how many people were in the car or who was driving it. Mann never told anyone that night what had happened because he thought the men would only take the victim's money and dope and then let him go. He did not go back to Ruby's as he figured she could not do anything. He testified that he walked around East 93rd Street "practically all night."
The next day when Mann was walking with Curtis Williams, the police were at Ruby's house. They called him over to talk. After he told them what happened, the police took him downtown to look at pictures. He picked the defendant out of a photo array.
Anita Smith, the sister of the victim, testified that the white Ford found at the scene belonged to her husband Thomas Daniels. He had loaned it to the victim the evening of October 5, 1997. Ms. Smith had seen the defendant two times before her brother was killed. The first time was approximately six months earlier when she was with the victim and he picked the defendant up. The second time was the night before her brother was killed.
Ms. Smith testified that on October 5, 1997, at about 7:00 p.m., her husband and the victim drove over to Amos Street to drop the victim off. There was a blue and gray Blazer parked in front of the driveway and the driver would not move it. She testified that the defendant then came out of the house. Her husband and the victim got into an altercation with the man in the Blazer. The defendant tried to stop it. During the altercation, the victim slapped the defendant and the defendant ran away. Ms. Smith testified that she, her husband and the victim then left the Amos home and went back to her house. At approximately 10:30 p.m. or 11:00 p.m., the victim asked Daniels if he could borrow his car. The victim was supposed to pick up her sons that night from her aunt's house on 93rd and Cedar. She testified that after the victim failed to return, his friend Romaine Engram came to her and told her that the victim had been kidnapped. The next morning, Ms. Smith called the police when her brother still had not come home.
Ruby Scales testified that she knew the victim from the neighborhood. He came to her apartment on the evening of October 5, 1997 and asked to use the telephone. They talked and watched television for awhile until Kenneth Mann arrived and asked if the victim could take him to the store. Mann wanted cigarettes and they were going to buy Ruby cigarettes and a beer. She told them to hurry because it was about 1:15 a.m. and you cannot buy beer after 1:30 a.m.
After they left, Ruby got up to lock her door. She then saw the victim on the passenger side of the white car and Mann on the driver's side. There were also two other males on the passenger side with the victim and it appeared that they were getting into the car. However, she could not identify the two other males because they had their backs to her. She also did not see any weapons. She hollered out the door asking if they were going to the store. Mann turned and said "yes, we're leaving now." She also heard another person mumble, "yeah, we're going to the store."
Ruby then went back into her apartment, locked the door and started watching television. No one ever came back that evening. She knew the victim to carry a gun, but did not think he had one that evening. She also knew the victim sold drugs. Ruby did not know who got in the car. When she first looked, all four were around the car. Then when she looked again, the car was pulling out and she saw no one in the lot. She assumed that they had all left.
Ruby testified that the next morning, after talking to Anita Smith, the victim's sister, she told the police what had happened the night before. As she spoke with the officer, Mann walked by down the street and she pointed him out to the officer as the man the victim left with to go to the store. The officer then immediately questioned Mann and left with him.
Thomas Daniels, the victim's brother-in-law, testified that he believed that the victim and the defendant were friends. He had seen them together on prior occasions. He stated that on October 5, 1997, at approximately 3:00 or 4:00 p.m., he and the victim went to a house on Amos Street. The victim was selling drugs there and defendant was using drugs. Daniels and the victim left after about an hour. Later that evening, at approximately 7:30-8:00 p.m., they returned to the Amos house where Daniels got into an altercation with a man in a Blazer who parked in the driveway of the house. During this altercation, the defendant and the victim began to fight. After the defendant and the victim fought, the defendant ran away. Daniels and the victim left. Daniels testified that the victim borrowed his car again later that night around 10:30 p.m.
Jerome Calloway testified that he saw the defendant on October 29, 1997. As he was driving down Central Avenue, he heard someone calling his name. It was the defendant who then asked him if he had heard what had happened on East 74th Street. The defendant asked if he heard about the shooting and then stated that "man it didn't go down the way that you heard." Defendant was trying to get money together for a bus ticket to Atlanta. During this conversation, defendant told him that he had to leave his gun in a field because he did not want to be caught by police with his gun on him. The next day, Calloway got the phone number of a barber who lends money and put the number under a phone booth for the defendant. Calloway testified that he did not deliver the barber's phone number to defendant's mother's residence because he knew defendant was not there, as the police had "been going by there quite frequently." After he left defendant the number, he called the police. He set up a meeting with the defendant to deliver the trip money and informed the police of this meeting. At that meeting, the police arrested defendant.
Over objection, the court allowed Detra Cook to testify. She was not a witness on the State's witness list. The State argued that they had just learned of her existence. Detra Simon Cook, a.k.a. Carolyn Smith, testified that she was in jail for a drug abuse case. She had been to prison for drug convictions before and had about four convictions altogether. She was hoping to receive a deal in return for her testimony. Specifically, that her misdemeanor case would be reduced so she could leave jail. Also, she hoped the felony five case would be dropped.
Detra Cook testified she knew the victim because she bought drugs from him. She saw the victim at her friend's house on the day the victim was killed. Her friend's name is "Ya Ya," a.k.a. Jerry Burchette. The victim was selling drugs and defendant was there. She testified that the defendant got sales for the victim, acting as the victim's "runner."
They were all at the house on Amos Street on October 5, 1997. She stated that the victim and defendant ended up getting into a fight over some guy in a Blazer parked out front. She left because she knew that the victim and the driver of the Blazer carried guns. She saw defendant run away after being beaten up by the victim and Daniels.
Around 2:00 a.m. on October 6, 1997, she saw the defendant at East 79th Street and Quincy. Defendant gave her a "ten piece" of crack which she thought was unusual. They then went to a friend's house and smoked it. She testified that while in the house, defendant pulled out a "bag of rocks" and was giving rocks away. He was not selling the crack, just giving it away. She was with the defendant from around 2:00 a.m. until 4:00 a.m. She also testified that when she first saw the defendant, he looked scared and said he was in a hurry. He also appeared excited that he had so much crack in his pocket.
That same evening, she saw the driver of the Blazer who was with the victim and the defendant at the house on Amos Street the previous day. Defendant said to her "loose lips sink ships." She took that as a threat.
Dr. Heather Raaf of the coroner's office testified that the victim died of six gunshot wounds. The victim had used cocaine and marijuana prior to his death, but he was not under the influence at the time of death. She observed that two different types of bullets were used, but she did not know if these bullets were used in different kinds of guns. Daniel Rowley from the forensic lab testified that the two bullets recovered from the victim's body were probably from a .22 caliber and a .25 caliber.
Edward Prinz of the fingerprint unit testified that sixteen prints were lifted from the white vehicle involved in the homicide. They were entered into the AFIS computer and two names came up, Wardell Engram and Anthony Carter. One other print was identified as the victim's.
Officer William Mone testified that he responded to a report of a possible dead body and arrived at the scene where the victim was discovered. The victim was not identified at the scene. Officer Mone later responded to a missing person's report from Anita Smith that he thought might be connected to the unidentified dead body. After speaking with Ms. Smith, Ruby Scales and Kenneth Mann, he had the name of a suspect and the police began looking for Juan Wallace.
Officer William Kelly arrested defendant on the evening of October 30, 1997 after setting up a plan with Jerome Calloway. The police had been searching for him for three weeks. The defendant did not have a gun on him when he was arrested.
Homicide detective Jack Bornfeld testified that he responded to the scene of the homicide and investigated the case. A warrant was issued for defendant on October 8, 1997, after interviewing several witnesses and after Kenneth Mann picked the defendant out of a photo array. They looked for the defendant for a few weeks before his arrest.
On October 31, 1997, Det. Bornfeld took a statement from the defendant. The defendant at first said he did not know the victim, but then later admitted to knowing him. Defendant stated that he had nothing to do with the victim's death. He stated that the victim had a deal with Jerry Burchette, allowing the victim to sell drugs out of Burchette's house on Amos Street.
The defendant stated to police that on October 5, 1997, he was at the house on Amos Street with the victim and a man named Tone (Thomas Daniels) who owns the white Tempo. The victim and Tone were fighting with a guy in a Blazer. Tone wanted the man to leave and an argument ensued. The victim had a gun and pointed it at the guy in the Blazer. The defendant stated that the victim thought the defendant was with the guy in the Blazer so the victim pointed the gun at defendant. The defendant and the victim fought and Tone yelled at the victim telling him that the defendant had nothing to do with it. The defendant then broke away and ran. The defendant denied ever being on East 93rd Street or 74th Street.
The detective showed the photo array to Rebecca Ward. She recognized Jerry Burchette and also the defendant because she knew his family. She stated that none of the people in the photo array were the driver of the white car she observed before the shots were fired.
The jury found defendant guilty of aggravated murder, two counts of kidnapping and having a weapon while under disability. Defendant now timely appeals.
We will address the assignments of error in the order asserted.
 I. THE TRIAL COURT ERRED WHEN IT ALLOWED THE TESTIMONY OF A NEWLY DISCOVERED WITNESS OVER THE APPELLANT'S OBJECTION, WITHOUT GIVING A CONTIUANCE.
On the second day of trial, March 19th, the prosecution announced the discovery of Detra Cook and their intent to call her as a witness. Defense counsel objected to this witness. She testified on Monday morning, March 23, 1998, six days after defense counsel was notified that she would be a witness in the case. Prior to her testimony, the court invited defense counsel to interview her in the County Jail where she was held. However, defense counsel never asked for a continuance to interview Ms. Cook.
Crim.R. 16 (D) states as follows:
 If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection.
Crim.R. 16 (E) (3) reads as follows:
 Failure to comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.
It is well established that a trial court possesses broad discretion as to the admissibility or exclusion of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, a reviewing court will not interfere. State v. Maurer (1984), 15 Ohio St.3d 239, 265. An abuse of discretion implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157-158.
Crim.R. 16 provides for discovery and inspection by either party in a criminal case. The purpose of Crim.R. 16 is to prevent surprise and the secreting of evidence favorable to one party.Lakewood v. Papadelis (1987), 32 Ohio St.3d 1, 3. Pursuant to Crim.R. 16 (D), the state is under a continuing duty to disclose any witnesses it adds to its witness list up to, and during, the time of trial. Crim.R. 16 (E) (3) authorizes the court to impose sanctions when a willful failure to act in accordance with this rule is established. "It is within the trial court's discretion to decide what sanction to impose." State v. Finnerty (1989),45 Ohio St.3d 104, 107.
While all violations of duties imposed by Crim.R. 16 involve a failure to comply with its requirements, not every failure constitutes a violation. If the failure was inadvertent or compliance was impossible, the failure is excusable. State v.Edwards (1976), 49 Ohio St.2d 31.
In the instant case, we find that the State fully complied with Crim.R. 16 (D). This rule merely requires that a party promptly notify and make available to the opposing party any newly discovered witness or evidence. The record reflects that when the State discovered the new witness, it immediately informed defense counsel of her existence. In fact, the defendant conceded at trial that the prosecutor provided the information as soon as the State learned of the new witness. The prosecutor also gave the name of the witness to defense counsel on the first day of trial, informed him of all the things the witness would testify to and informed him that the witness was incarcerated in County Jail.
Furthermore, defendant's assertion that there was no time to investigate the witness is unpersuasive. The record reflects that the new witness did not testify until six days after defense counsel was informed of her existence and location. As a result of the late discovery of this witness, neither party could thoroughly investigate her and her potential testimony. Accordingly, both parties had a short but equal opportunity to investigate Detra and defendant cannot establish that he was prejudiced by her late disclosure by the State.
Based on these facts, the State fully complied with Crim.R. 16 (D) as it informed defense counsel of the name and location of Detra immediately after she was discovered. Therefore, the State "promptly" notified and made her available for discovery to the defense as required by Crim.R. 16 (D). We find no abuse of the trial court's discretion in allowing Detra to testify at trial.
Defendant's Assignment of Error I is overruled.
 II. THE TRIAL COURT ERRED WHEN IT ALLOWED IMPERMISSIBLE HEARSAY TESTIMONY WHICH UNFAIRLY PREJUDICED THE APPELLANT'S CASE.
The witness, Jerome Calloway, testified that he had a conversation with the defendant on October 29, 1997. at East 55th and Central Avenue after defendant hailed him as he was driving by in his car. Mr. Calloway and the defendant then engaged in a conversation. The conversation objected to is defendant's statement that the shooting did not go down as Calloway heard about it.
Q. How did you hear that it went down?
 A. I heard that he did it, but he was saying, in so many words, that it didn't go that way.
(Tr. 549-50)
Evid.R. 801 (C) defines hearsay as follows:
 Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
Defendant asserts that this statement was offered to prove the truth of the matter asserted or more specifically, "to prove that everyone in the neighborhood believed that the appellant had committed the murder." The State, on the other hand, asserts that the statement was not being used to prove that defendant committed the murder.
We find that the statement was not being used to prove its truth. It was merely being used to show the context of defendant's conversation with Mr. Calloway and to show defendant's state of mind while attempting to borrow money for a bus ticket in order to leave the jurisdiction. In fact, this statement expresses that defendant was asserting that he did not commit the murder and that it did not go down as Mr. Calloway had heard. Accordingly, this statement was not being used to prove that defendant committed the murder and therefore, it did not constitute inadmissible hearsay. The trial court did not err in admitting this evidence at trial.
Defendant's Assignment of Error II is overruled.
 III. THE TRIAL COURT ERRED BY PROVIDING THE JURY WITH AN ERRONEOUS CAUSATION INSTRUCTION.
Defendant contends that the second paragraph of the standard causation instruction contained in the Ohio Jury Instructions was erroneously given to the jury. The instruction was not objected to at trial. In this case, the court gave the following instruction:
 Natural consequences. The defendant's responses is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable consequences or results that will follow in the ordinary course of events from the act or failure to act.
(Tr. 802)
In State v. Jacks (1989), 63 Ohio App.3d 200, this Court reversed a murder conviction because of the causation instruction given by the court. The objected-to instruction read as follows:
 The causal responsibility of a defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable result that follows in the ordinary course of events from an unlawful event.
 The test for foreseeability is not whether the defendant should have foreseen the injury in its precise form or to a specific person. The test is whether a reasonably prudent person, in like and similar circumstances would have anticipated that death is likely to result to anyone from the performance of the unlawful act.
Jacks, supra, at 204-205.
Defendant relies on Jacks, supra to support his assertion that the causation instruction given in this murder case erroneously applied the negligence standard rather than the requirement of specific intent. However, the instructions given in this case were completely different from those given in Jacks and the court in Jacks focused exclusively on the objected to causation instruction for its decision, rather than the instructions as a whole.
In State v. Burchfield (1993), 66 Ohio St.3d 261, 262, the Ohio Supreme Court expressed that, when reviewing a causation instruction, the jury instructions must be considered as a whole rather than individually and the court must consider the instructions given before and after the objected-to instruction. The Court stated:
 In the present case, the trial court used virtually identical language regarding causation. However the jury instructions as a whole are significantly different from those in Jacks. In this case, there were extensive instructions regarding purpose given prior to the causation instruction. Those instructions were drawn from OJI § 409.01 and included the instruction that purpose can be inferred from the use of a deadly weapon.
In the case of State v. Stoudemire (1997), 118 Ohio App.3d 752, this Court once again had the opportunity to address this issue. This Court stated:
 Burchfield considered precisely this issue and found that the instructions issued in that case differed significantly in whole from those used in Jacks because: (1) there were extensive instructions regarding purpose given prior to the causation instruction; and (2) the court reiterated the purpose instruction immediately following the causation instruction.
 These same considerations lead us to conclude that the instructions given in this case, as a whole adequately instructed the jury that it could convict only upon a showing of purposeful behavior. As in Burchfield, the trial court instructed the jury on purpose before instructing on causation. Likewise, the trial court instructed the jury that it could infer purpose from the use of a deadly weapon. Finally, the evidence would not reasonably have permitted the jury to find the defendant acted with any mental state other than to purposely kill the decedent. The coroner testified that the victim had been shot five times, with the fatal bullet entering in the lower back from very close range. Defendant denied shooting decedent, so he presented no evidence suggesting that the murder had been committed either knowingly or recklessly. Under these circumstances, we are unable to find that the instruction on causation prejudiced defendant to the extent that plain error resulted.
Id. at 760-76
In the instant case, the instructions given also adequately instructed the jury that it could only convict defendant based on purposeful behavior. The record clearly reflects that trial court thoroughly instructed the jury on "purpose" and "specific intent" immediately prior to instructing on causation. The record also reflects that the jury was instructed that "purpose" could be determined from the weapons used. Considering the instructions as a whole, the jury was adequately instructed that, in order to convict defendant of aggravated murder, it must find that he "purposely" intended to cause the death of the victim. Therefore, the causation instruction given by the trial court did not permit the jury to find defendant guilty on the basis of negligence instead of purposeful behavior as required by R.C. 2903.01.
Furthermore, as this Court found in Stoudemire, the evidence in the instant case would not reasonably have permitted the jury to find that the defendant acted with any mental state other than to purposely kill the victim. The testimony of the coroner established that the victim was shot six times. Like the defendant in Stoudemire, a the defendant in this case denied shooting the victim. Accordingly, defendant has failed to establish that he was prejudiced by the causation instruction as he has presented no evidence that the murder was committed either knowingly or recklessly rather than purposely.
Defendant's Assignment of Error III is overruled.
 IV. THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE CONVICTIONS OF AGGRAVATED MURDER AND KIDNAPPING.
The standard of review we must observe in passing on sufficiency of the evidence and manifest weight of the evidence issues were set forth by the Supreme Court of Ohio as follows inState v. Thompkins (1997), 78 Ohio St.3d 380, 386-87:
 The state asserts that sufficiency of the evidence and weight of the evidence are synonymous legal concepts. They are not. The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
 With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29 (A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict, is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ""thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.")
The evidence in this case can be summarized as follows: the victim was shot six times in the backyard of 2199 East 74 Z Street at approximately 2:00 a.m. on October 6, 1997. The victim was a drug dealer working out of 8019 Amos Avenue and the defendant was a runner for him. In the afternoon of October 5, 1997, the victim and the defendant had a physical altercation after which the defendant ran away. Later that evening, the victim arrived at the home of Ruby Scales and remained there until the early morning hours of October 6, 1997. At approximately 1:15 a.m., the victim and Kenneth Mann decided to drive to the store to buy cigarettes. As they were leaving, two black males, one identified by Mann as the defendant, approached them, made them lay on the ground and held them there at gunpoint. As Mann laid on the ground, he heard one of the men tell the victim "you know you crossed me." Mann was then released and as he ran up the street, he saw the two men drive away towards Quincy Avenue with the victim in the victim's white car.
At approximately 1:50 a.m. to 2:00 a.m., several witnesses, including Rebecca Ward and her friends, saw the victim's white car stop in front of a house on East 74th Street. When the car stopped, her friends ran up the driveway and into a neighboring field. Rebecca stayed and saw three black males in the car. When one of the men got out of the passenger side of the car wearing a ski mask, she ran. She then noticed the victim get out of the back seat of the car and run up the driveway behind her.
Daneca Cook was on the side of the house when the car arrived. As her friends started screaming and running, she heard a gun shot and ran to the back of the house. She heard two or three more shots when she reached the back of the house. She then laid on the ground close to the house and put her head down. When she looked up, she saw the victim backing up to her saying "please don't do this. I swear on my mama I gave you everything, all that I had." She then observed the victim shot two more times and fall on top of her. Daneca believed that the shots were fired at about 2:00 a.m.
Detra Cook testified that around 2:00 a.m., she saw the defendant at East 79th and Quincy where he gave her a "ten piece" of crack which she thought was very unusual since he worked for a drug dealer. Defendant looked scared and in a hurry. She then went to a friend's house with defendant where defendant pulled out a "bag of rocks" and started giving them away, rather than selling them. He appeared excited that he had so much crack in his pocket.
After interviewing several witnesses, the day after the murder the police suspected the defendant and began to search for him. The defendant eluded the police for 23 days and on October 29, 1997, he approached Jerome Calloway attempting to get money to buy a bus ticket to Atlanta. During the conversation, defendant also told Calloway that he had to leave his gun in a field because he did not want to be caught by the police with it.
Based on this evidence, defendant's convictions were supported by sufficient evidence and not against the manifest weight of the evidence. The evidence was sufficient to establish beyond a reasonable doubt that defendant purposely caused the death of the victim. As stated above, a verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Furthermore, the weight to be given evidence and the credibility of witnesses are primarily for the trier of fact to determine. State v. DeHass
(1967), 10 Ohio St.2d 230.
There was substantial testimony for the jury to conclude that defendant had a motive to kill the victim, that he kidnapped the victim, that after killing the victim he took the victim's crack supply and money and that after eluding the police, he sought help to flee the jurisdiction. The jury clearly did not lose its way and this conviction did not create a manifest miscarriage of justice. Therefore, defendant's conviction for aggravated murder was not against the manifest weight of the evidence.
Defendant's Assignment of Error IV is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, J., and ROCCO, J., CONCUR.
 _____________________ JAMES M. PORTER ADMINISTRATIVE JUDGE